McAFEE v. OVERBERG, DIR., LONDON CORRECTIONAL INSTITUTE.

(No. 76-0432—Decided July 13, 1977.)

Court of Claims.

*Mr. Nicholas J. LaScalea* and *Mr. Michael F. Gehrig,* for plaintiff. :
*Mr. William J. Mooney,* for defendant.

BAYNES, J.  Plaintiff alleged physical injuries received as a result of negligence in the operation of tandem farm wagons hitched to a farm tractor.  As a result of falling off the first wagon, a wheel of the second wagon ran over plaintiff's mid-section.  His principal injury was a ruptured spleen which had to be surgically removed.  The prayer was for $85,000, which at trial was reduced to $32,500.

Defendant generally denied and affirmatively alleged defenses of contributory negligence and assumption of the risk.  Following submission of the evidence, the defendant did not allude to the assumption of risk defense.  By the evidence, the issues are defendant's negligence, plaintiff's contributory negligence and damages.  There was little, if any, conflict in the facts relating to the accidental occurrence.  As to the damage issue, there was a substantial conflict.

I.

London Correctional Institute is a medium security place of confinement.  The acreage is sufficiently large to

permit an extensive live stock and grain operation. From the secured area (distinguished from the honor camp), "gangs" of inmates up to a maximum of nineteen men are placed under the supervision of an armed officer who supervises the inmates in performing work assignments made by the farm manager.

The long-time method of transporting inmate farm "gangs" on February 13, 1976, was on farm wagons pulled by a farm tractor. The inmates occupy the wagon to which the tractor is hitched and the second wagon is occupied by the armed officer, who may, at times, be accompanied by a "water boy" or honor inmate. The farm wagon beds were 7 X 14 feet, or 98 square feet of space. They had no side boards, racks, ladders or standards around the bed or at the ends.

The inmates would stand on the bed of the wagon facing forward. The tractor operator-inmate pulled the wagons at a speed not in excess of 10 m. p. h. on a hard surfaced 20 foot wide roadway in good condition. Between the work area on February 13 and the gate to the secured area, about a mile in length, the tractor operator would slow down at an abrupt curve and also where railroad tracks cross the roadway.

Plaintiff had been assigned to a farm "gang" for about fourteen months and had experienced a jerking from time to time while standing on the wagon, and he had never known an inmate to fall from a wagon in that period.

On the day in question, plaintiff was at the left rear corner of the first wagon, facing forward. His heels were 12 to 18 inches from the bed edge. After the inmate-operator of the tractor was about 100 feet past the railroad tracks, in the process of shifting gears, he, according to the "gang" officer, "released the clutch too fast." At this point, the wagons were jerked. Plaintiff turned to more or less face the rear and attempted to jump, as he was positioned, to the back wagon. He fell to the roadway and grabbed the left front corner of the rear wagon. In some manner, he was dragged under the left rear wheel which ran over his mid-section.

The inmate-operator of the tractor, one Lewis Ramsey, since paroled, was attempted to be subpoenaed by plaintiff to testify as a witness but had not been served by time of trial. The evidence tends to show that he had experience as a motor vehicle operator. That for a period of some three to five days prior to February 13, 1976, he had instruction (of some kind) from another inmate tractor operator. To the "gang" officer's recollection, this was the first day he could recall that inmate Ramsey had operated the tractor. Although yelled at by the inmates to stop the tractor after plaintiff fell, he did not promptly do so.

Plaintiff suffered scratches on his left forearm and on his mid-section. There were small cuts on the left side of his head above the eye and ear. After the spleen was surgically removed, a moderately sized subcapsular hematoma had evacuated itself and had not reformed on the left lobe of the liver. Plaintiff's recovery was excellent. He was released from the hospital and was returned to London on February 24. He had a final check on March 11, 1976, and was released without restrictions. He was returned to the farm "gang" for some period of time prior to June 23, 1976. On his complaint, the London Correctional medical director recommended a work assignment which would avoid lifting until August 22, 1976.

He was paroled February 2, 1977. He consulted a specialist in internal medicine in Cincinnati on March 12, 1977. He complained of easy fatigue, inability to lift, lack of stamina and appetite. A keloid has formed at one of the stitches of the incision which is tender and probably will, in the future, require surgical repair or other treatment. Plaintiff saw the doctor two or three additional times to June 10, 1977. The plaintiff was five feet, nine inches tall and weighed 122 to 126 pounds in the March-June, 1977 period. His weight on February 13, 1976 was 120 pounds.

## II.

From the evidence, it is our view that the sole question of the case is one of whether defendant was negligent. A liberal analysis of the evidence possibly raises issues of contributory negligence, which is an affirmative defense. There

is no evidence sufficient to raise an issue of assumption of the risk.

A recovery by plaintiff must be based on defendant's duty, a breach of that duty, and injury.

With respect to the duty, the state was not required to exercise the highest degree of care. The state was required, if it was necessary to furnish inmates transportation between the work area and resident quarters, to furnish a safe and adequate means. *Murray* v. *State* (Ct. Claims 1933), 262 N. Y. Supp. 336. From the evidence in the case based upon foreseeability, it cannot be concluded that the means of transportation used was *per se* unsafe or inadequate.

Allowing a minimum of one foot free space around the perimeter of the bed of the wagon would leave 60 square feet of utilizable standing space (7' X 14' = 98 sq. ft. less 28 and 10 sq. ft. = 60 sq. ft.). With 15 men on the wagon, this would allow each one four square feet of space for standing room, which if adjusted to square inches of rectangular space, and would support plaintiff's estimate that his heels were 12 to 18 inches from the edge of the wagon bed.

The state is not an insurer of the safety of all of its inmates. Therefore, the fact, if it is a fact, the possibility existed that by some means or another, an inmate might be injured by falling off a wagon, for whatever reason, was a mere possibility and not a probability under the circumstances described. The law deals in probabilities and not possibilities.

We next consider whether or not either the inmate-operator's limited experience in operating a farm tractor, or the "too fast" release of the clutch, constituted negligence of the defendant which was a proximate cause of the accident and plaintiff's injuries.

We overruled, at trial, plaintiff's motion for a continuance when it was reported the Sheriff of Licking County had not yet served former inmate Ramsey with a subpoena mailed to the Sheriff by certified mail on June 21, 1977, for trial on June 30, 1977. The return of the Sheriff stated, in response to request to personally serve the subpoena, "I

was unable to serve it upon him (Ramsey) for the following reasons: out of the county and don't know when he will return." Plaintiff had the obligation to take every precaution to insure the attendance of his witnesses. The reliability and availability of an inmate, or former inmate, may be considerably less than a reasonable probability.

Moreover, Carl Bailey, defendant's retired farm superintendent, who had sole authority over assignment of tractor operators, was subpoenaed by plaintiff and was present but not called. This case had been assigned since February 24, 1977. There was no reason why Ramsey's deposition could not have been taken as upon cross examination. Even though not an employee of defendant, Ramsey was performing his driver function under the direction and control of defendant's officer. To the extent of his function, the state had made him its agent. *Washington* v. *State* (App. Div. 1950), 100 N. Y. Supp. 2d 620; *Cassidy* v. *State* (Ct. of Claims 1957), 161 N. Y. Supp. 2d 903.

Although letting out the clutch "too fast" might be more likely to happen with a tractor operator of limited experience, it could and did occur otherwise from time to time. So, it was not in and of itself an unexpected event as demonstrated by plaintiff's evidence. This leads to a next substantial question as to whether the wagon from which plaintiff fell was "violently jerked in multiple succession" as claimed in the trial brief and opening statement.

The law with respect to a jerk in the operation of a vehicle is most often the subject of litigation between passengers and common carriers, including elevators and escalators. *Welch* v. *Rollman & Sons Co.* (1942), 70 Ohio App. 515; *Domany* v. *Otis Elevator Co.* (U. S. C. A. 6, 1966), 13 Ohio Misc. 161; *Reiser* v. *Cincinnati Street Ry.* (1952), 92 Ohio App. 24.

The only Ohio case we have noted with respect to an employee is that of *Alexander* v. *N. Y. Cent. Rd. Co.* (1963), 1 Ohio App. 2d 460, in which Judge Troop of the Tenth District Court of Appeals stated at page 463:

"There is testimony here of a jerk that could be said to describe it as unusual."

The observation was made with respect to the neces-

sity of submitting the issue of the negligence to a jury. (The trial court had directed a verdict for defendant.)

The rule stated in a carrier case, *Yager* v. *Marshall* (1935), 129 Ohio St. 584, paragraph two of the syllabus, is:

"In order to prove such negligence there must be evidence indicating a jerk unusual in some respect such as its suddenness, force or violence."

In other words, as stated in *Reiser, supra,* paragraph one of the syllabus, if the jerk was necessarily an incident to proper operation, no liability to the street railway may be imposed on defendant and plaintiff could not recover. It followed, as stated in paragraph two of the syllabus, that in determining whether the jerk was usual or unusual, one may not consider the force of plaintiff's fall. The reason for the fall must be determined from evidence relevant to the physical facts relating to the jerk and not the fact of the fall.

In the case before us for decision, the fact that none of the other 14 inmates on the first wagon or the officer on the second wagon were knocked off their feet or fell from the wagons by reason of the force of the jerk is only remotely, if at all, relevant to inferring whether the jerk was violent. It does not tend to prove an unusual movement of the vehicles. In any event, there was no direct evidence or fact from which it might be inferred that there was a "multiple succession" of jerks.

The evidence does fail to show that plaintiff was buffeted by the others or impelled, propelled or forced off the wagon by virtue of any contact with any of the other inmates on the wagon on which he was standing. The officer's statement that Ramsey, the inmate tractor operator, "released the clutch too fast" does not lend itself to the sole inference that by reason thereof, the jerk was unusual or violent, if any inference is warranted. Nor does plaintiff's testimony that he turned toward the second wagon and attempted to jump to the second wagon after the jerk, standing alone, infer that the jerk was violent. Neither of these facts was or is descriptive of the force of the jerk.

Cf. *Cleveland Ry. Co.* v. *Hunt* (1927), 116 Ohio St. 291; *Cleveland Ry. Co.* v. *Merk* (1932), 124 Ohio St. 596, 598 (note paragraph one of the syllabus).

Moreover, whatever the condition of the surface of the wagon bed may have been, from its use immediately prior to plaintiff's fall, there is insufficient evidence to find or conclude that such condition was a precipitating factor in determining whether defendant was negligent. (It had been used to haul cow manure from the dairy court.)

The second to the final question relates to the failure of the inmate-operator, Ramsey, to stop the vehicles sooner than he in fact did. The testimony of the officer in charge of the "gang" was that plaintiff was dragged ten feet before the left rear wheel of the second wagon ran over his mid-section.

No evidence was introduced as to the stopping distance of a tractor at a speed of five to ten miles an hour pulling two wagons plus the weight they were carrying. Assuming the tractor was not equipped with an automatic transmission, it would be necessary to disengage the transmission by depressing the clutch prior to applying the brake pedal. Matters of tractor noise and other sounds immediately prior and contemporaneous with the realization that a man was overboard would be factors affecting the stopping, none of which are in evidence.

So, the opinoin of the officer in charge of the "gang" that Ramsey, the operator, should have stopped the vehicles so that plaintiff might not have been run over is not supported by descriptive facts from which such conclusion could be judicially reached.

The probabilities are that the distance between the tread of the wagon wheel tires on the road surface was less than ten feet. Plus, the fact that plaintiff did hang on with one hand to the left front of the second wagon for some seconds prior to the ten foot dragging can only mean that the outfit did move forward more than ten feet. There was no testimony of the distance between the left rear wheel when the outfit was stopped, and the point where plaintiff was lying on the road.

In view of the fact that the state of the evidence is as it is, plaintiff relies on a rule recognized in New York Court of Claims that even in the absence of positive proof, negligence may be inferred from the circumstances surrounding the injury, if not from the fact of injury itself; *Cassidy, supra,* citing *Garrow* v. *State* (1944), 268 App. Div. 534, 52 N. Y. Supp. 2d 155.

The fact of injury itself phrase is stated in *National Mattress Co.* v. *Youngstown* (1957), 78 Ohio Law Abs. 526, at page 530, thus: Evidence is never a proximate cause; it is the factual circumstances raised by the evidence which gives rise to the causal relationship from which proximate cause is found or not found.

Except for the case posture in *McComis* v. *Baker* (1974), 40 Ohio App. 2d 332, wherein the appeal was from a judgment for defendant n. o. v., from the trier of the fact standpoint, the fact situation is analogous. In *McComis,* the sole direct evidence of plaintiff was, "all I know is that something caught me by the heel, and the next thing I knew I was going." In that case, plaintiff was carrying a basket of clothes to be washed and had her back to the screen door at the doorway which she was entering. In the instant case for decision, the direct fact is that the wagon jerked and plaintiff "fell."

There were, of course, surrounding circumstances in *McComis, supra,* where the appellate court noted that the evidence was not overwhelming and the time interval between plaintiff's fall and claimed defective screen door condition alleged to be found gave rise to some "apprehension." To support the jury verdict and to supply the basis for a finding of negligence, the court noted propositions contained in 30 American Jurisprudence 2d 285, Evidence, Section 1120. That section generally tends to support the proposition stated in *Cassidy* and *Garrow, supra.*

In *McComis, supra,* at page 336, the court observed that plaintiff, for the most part, was forced to rely on circumstantial evidence which is not fatal where the chain of circumstances leads to a conclusion which is more probable than any other hypothesis reflected by the evidence.

The only direct fact in *McComis* was the fact of injury itself.

The American Jurisprudence 2d, section, *supra*, at page 287, concludes that in proving negligence, circumstantially absolute certainty cannot be achieved. Equipoise of the evidence will not entitle plaintiff to a verdict so that if the evidence lends equal or balanced support to inconsistent conclusions or equally consistent with contradictory hypotheses, the asserted fact would not have been established. Cf. *Cleveland, Terminal & Valley Ry. Co.* v. *Marsh* (1900), 63 Ohio St. 236, paragraph four of the syllabus.

From all of the foregoing, the facts and the law focus on the issue of foreseeability. For if the combination of circumstances in this case could have reasonably been foreseen, bearing in mind that the state is not an insurer of possible injuries to inmates in custody, it would be liable. It is a close question to which reasonable minds may have different conclusions. Certainly plaintiff's injury was not unavoidable. So, the ultimate question is, who should bear the loss, if foreseeability is to be determined in plaintiff's favor. The fact is that plaintiff, as an inmate, is without freedom of choice.

In *Knickel* v. *Dept of Transportation* (1976), 49 Ohio App. 2d 335, 339, it was concluded that the better answer, in view of the state's duty to maintain the highways in a reasonably safe condition, under the particular facts, that the state should bear the loss. Is such the case here, with the state's duty to provide safe transportation?

The argument was made to the court that to the extent that a verdict was entered in plaintiff's favor was less than the reduced prayer of $32,500, the court would be doing partial justice and partial injustice. We do not find such proposition logically sound, warranted by the evidence and therefore not persuasive, and it is therefore unproductive. Certainly plaintiff, if he is entitled to a verdict, has suffered permanent injury by reason of loss of his spleen. He also experienced pain and suffering, at least during the period of total disability, February 13, 1976, to March 11, 1976, or four weeks, and partial disability from March 12,

1976, through August 22, 1976, or 23 weeks and three days. Such pain would be of decreasing intensity and frequency over this somewhat extended period.

The keloid at one of the incision stitches is somewhat irritating and will, no doubt, require corrective surgery or therapy in the immediate future.

We do not find the medical opinion of plaintiff's doctor, claim of fatigue, loss of appetite, epigastritis distress, vomiting of blood and weakness, to be proximately causally related to his original injury to preponderate. Likewise, a spleenectomy will not contribute to cause, to any appreciable extent, plaintiff's demise at such time as his last sickness occurs, if at all.

### III.

The court concludes as a matter of law that under the totality of the circumstances existing on February 13, 1976, at 4:00 P. M., that the defendant institute was negligent in failing to furnish plaintiff with a safe and adequate means of transportation while he was engaged in the work assignment at the London Correctional Institution.

Plaintiff is entitled to a dismissal of the affirmative defenses to the complaint, failing to state a cause of action for which relief may be granted, and that plaintiff assumed any of the risks in being positioned as he was at the time and place in question.

Plaintiff's efforts to protect himself from the consequences of the situation, which defendant's transit caused to occur did not constitute a failure to exercise ordinary care for his own safety, under the circumstances. He was not negligent.

The proximate cause of plaintiff's injuries was the negligence of the defendant aforestated.

We finally conclude, on the issues joined and the evidence, that plaintiff is entitled to a judgment of $6,500. A judgment is, therefore, concurrently entered.

*Judgment for plaintiff.*